UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:    Judges Huff, Ortiz and Friedman
Argued by videoconference


AMANDA WADE

                                                      MEMORANDUM OPINION* BY
v.         Record No. 1416-20-1                       JUDGE DANIEL E. ORTIZ
                                                      NOVEMBER 23, 2021

CITY OF HAMPTON
  DEPARTMENT OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
Michael A. Gaten, Judge

Charles E. Haden for appellant.

L. Olivia Wiggins (Cheran Cordell Ivery; Tier L.T. Burks, Guardian
*ad litem* for the minor children; Hampton City Attorney's Office;
Burks Law Firm, PLC, on brief), for appellee.


Amanda Wade ("mother") appeals two orders terminating her parental rights to two of

her children ("twins") from the Circuit Court of the City of Hampton ("circuit court").  On

appeal, the mother argues that the circuit court erred in (1) preventing the mother's counsel from

cross-examining a social worker about the mother's participation in services provided by the

City of Hampton Department of Social Services ("DSS"), and (2) terminating her parental rights

under Code § 16.1-283(C)(2).  Though the trial court abused its discretion in limiting the social

worker's cross-examination, this Court affirms the trial court's decision to terminate the

mother's parental rights for the reasons set out below.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

In February 2019, DSS filed emergency petitions to remove the then five-year-old twins after a DSS investigation revealed that the twins had been padlocked in bedrooms for long periods. The twins' feces and urine "saturated" the carpets in those bedrooms because they could not access the bathroom while padlocked in the rooms. During its investigation, DSS also discovered that the twins' father, Oliver Wade ("father"), allegedly sexually abused the mother's then eight-year-old daughter. Once interviewed by DSS, the twins reported that the mother and the father had hit them with switches on their butts, backs, and possibly one of the twins' head. One twin claimed that the mother hit him with a wooden spoon. During a forensic interview, the twins also reported that their eldest half-brother sexually assaulted them.

Although DSS's initial foster care goal was to return the twins to the mother's custody, DSS determined the mother was unable to substantially remedy the concerns that led to the twins' removal. Approximately fourteen months after DSS removed the twins from the mother's care, DSS petitioned the Hampton Juvenile and Domestic Relations District Court ("JDR court") to approve the permanent planning goal of adoption for the twins and terminate both parents' rights. The JDR court approved the foster care goal of adoption and terminated the mother's and the father's parental rights to the twins. Both parents appealed to the circuit court.

During the *de novo* hearing in the circuit court on December 15, 2020, DSS social worker Jennifer Parker ("Parker") testified for DSS. She discussed the state of the home, the sexual and physical abuse and physical neglect of the twins, and several of the DSS-provided services the

_____

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues the mother has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

mother completed, including a parental capacity evaluation, individual therapy, parenting classes, and supervised visitation. She also noted the mother obtained employment pursuant to DSS's recommendation. Additionally, Parker testified about the two remaining barriers to reuniting the twins with the mother: (1) concerns about the mother's parental capacity to protect the twins and (2) her lack of adequate housing.

DSS's paramount concern was the mother's lack of parental and protective capacity. Although no charges or formal Child Protective Services ("CPS") complaints were brought against the mother, DSS identified several issues regarding the mother's protective capacity. First, the mother made several concerning comments regarding rape and her relationship status and displayed a "nonchalant attitude" about the serious allegations against her husband and eldest son. The mother claimed she was unaware of the allegations and expressed doubt about both the allegations of her daughter's sexual abuse and the twins' sexual assaults. Moreover, despite the allegations against her eldest son, the mother asked DSS if the son could attend the supervised visits with the twins. When asked whether she was trying to foster a relationship between the twins and the eldest son by asking to bring him along, the mother admitted that she solely wanted to test the truthfulness of the twins' accusations. She hoped to determine if the twins were lying by watching their reaction to seeing their half-brother.

Further, the mother left the home for a time in 2018 after a marital dispute with the father. During that time, the mother left the twins and her five other children, the twins' half siblings, with the father. Additionally, the mother lived with her sex offender paramour for about a year after DSS removed the twins, all while knowing that DSS could not place the twins with her while she resided with him. She did not break up with the sex offender until approximately forty days before the second permanency planning hearing in the JDR court. When asked why she waited to break up with the sex offender, she testified at the circuit court

trial that her "relationship status is totally separate from [her] kids." Lastly, the mother admitted she knew at least one of her children's rooms had a padlock on the outside of the door.

The other barrier identified by DSS was the mother's inability to secure housing. She applied for public housing but received a letter dated July 15, 2019, which indicated she should expect to wait thirty-six to seventy-two months before placement. Despite knowing that housing would be unavailable for many months, the mother did not secure housing until four days before the December 2020 trial in the circuit court. Given the late timing and the apartment's lack of furnishings, DSS was unable to verify that her housing was appropriate.

On cross-examination, the mother's counsel attempted to ask Parker about the services the mother completed to regain custody of the twins. DSS objected to the relevance of that line of questioning, and the circuit court sustained the objection. The circuit court accepted DSS's explanation that the services the mother completed were irrelevant to whether she had substantially remedied the barriers to reunification. The mother then proffered the testimony Parker would have given if the court allowed the cross-examination on that subject. The proffer detailed the various services provided by DSS that the mother participated in, including monthly and quarterly meetings (the Pathways to Permanency and the Family Assessment and Planning Teams meetings), therapeutic supervised interactions with the twins, and outpatient therapy services. She also completed a parental capacity evaluation, a parenting course, and the required background checks that revealed no barriers. Pursuant to DSS's request, the mother obtained and maintained employment and eventually obtained housing.

During the mother's direct examination, the mother's counsel questioned her about her current employment and the steps she took to address DSS's concerns. DSS objected several times, reiterating that the only relevant question was what the mother had not done. Instead, the circuit court agreed to give the mother's counsel "a little latitude" to question the mother about

her employment, the services she participated in, and the fact that she completed everything DSS asked of her. Ultimately, the circuit court terminated the mother's parental rights and approved the foster care plan with the goal of adoption. This appeal followed.

ANALYSIS

A. Standard of Review

Regarding the circuit court's decision to limit cross-examination, we will not disturb a trial court's decision on the admissibility of evidence unless the trial court abused its discretion. Carter v. Commonwealth, 293 Va. 537, 543 (2017). However, "a trial court . . . 'abuses its discretion when it makes an error of law.'" Shooltz v. Shooltz, 27 Va. App. 264, 271 (1998) (quoting Koon v. United States, 518 U.S. 81, 100 (1996)). "In determining whether the trial court made an error of law, 'we review the trial court's . . . legal conclusions *de novo.*'" Rollins v. Commonwealth, 37 Va. App. 73, 79 (2001) (quoting Timbers v. Commonwealth, 28 Va. App. 187, 193 (1998)).

In assessing a circuit court's decision to terminate parental rights, "we view the evidence in the light most favorable to the prevailing party, in this case, [DSS], and grant to it all reasonable inferences fairly deducible from the evidence." King v. King George Dep't of Soc. Servs., 69 Va. App. 206, 210 (2018) (quoting Farrell v. Warren Cnty. Dep't of Soc. Servs., 59 Va. App. 375, 420-21 (2012)). Further, this Court presumes that "a 'trial court . . . thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cnty. Dep't of Fam. Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cnty. Dep't of Hum. Dev., 13 Va. App. 123, 128 (1991)). As such, a circuit court only abuses its broad discretion regarding a child's best interests when it makes a decision that is "plainly wrong or without evidence to support it." Farley v. Farley, 9 Va. App. 326, 328 (1990). Even if the trial court failed to recite the bases for

its determination, the court's decision will be affirmed if the record discloses the circuit court's main concern was the child's welfare and the decision was in the child's best interests. Id. at 329.

B. The Circuit Court Erred in Limiting the Social Worker's Cross-Examination

Evidence sought on cross-examination must be relevant. Velocity Express Mid-Atlantic, Inc. v. Hugen, 266 Va. 188, 205 (2003). "Evidence is relevant if it tends to prove or disprove, or is pertinent to, matters in issue." Id. (quoting Clay v. Commonwealth, 262 Va. 253, 257 (2001)).

Additionally, "cross-examination on a matter relevant to the litigation" is a fundamental right in both criminal and civil cases. Campbell v. Campbell, 49 Va. App. 498, 504 (2007) (noting cross-examination "is not a privilege but an absolute right" (quoting Basham v. Terry, 199 Va. 817, 824 (1958))). Although the permissible latitude of a witness' cross-examination is within the trial court's sound discretion, that discretion is not unrestrained. Id. Yet, trial courts may limit cross-examination according to the rules of evidence, provided the party's cross-examination right "has been substantially and fairly exercised." Id. at 504-05 (quoting 20 Michie's Jurisprudence, Witnesses § 36 (2004)).

In the present case, the circuit court abused its discretion in limiting the mother's cross-examination of Parker about the services the mother completed. Under Code § 16.1-283(C)(2), a court must look at (1) the child's best interests and (2) whether the parent substantially remedied the conditions that led to foster care. Thach v. Arlington Cnty. Dep't of Hum. Servs., 63 Va. App. 157, 169 (2014). Under the first prong, the circuit court must consider, among other things, "the relationship existing between the parent and the child . . . [and] the role the parent has played, and will play in the future, in the upbringing and care of the child." Id. Once the court decides that termination is in the child's best interests, the circuit court then moves to the second prong. Id. at 170. The second prong requires the court to find

clear and convincing evidence the parent failed "without good cause" to remedy the conditions that led to foster care, despite DSS's provision of proper services to the parent. Id.; see also Code § 16.1-283(C)(2).

The circuit court disproportionately emphasized the second prong. In sustaining DSS's objection to the mother's cross-examination of Parker, the court appears to have assumed the services the mother engaged in were irrelevant to establish whether she had substantially remedied the conditions. Even if those services were irrelevant to the second prong, they were relevant to the child's best interests analysis because courts must consider the role a parent played in raising his or her child and the relationship between the parent and child. The services the mother completed were relevant to assess the role she played and would have played in caring for the twins and to demonstrate her relationship with the twins. Therefore, the circuit court erred in restricting the mother's cross-examination of Parker.

### C. The Circuit Court's Error Was Harmless

Although completely prohibiting cross-examination is never harmless error, Campbell, 49 Va. App. at 504-05, Virginia courts have reviewed a trial court's decision to limit cross-examination for harmless error. See Code § 8.01-678 ("[N]o judgment shall be . . . reversed . . . [f]or any other defect, imperfection, or omission in the record, or for any error committed on the trial" if the record and evidence plainly reveal the parties "had a fair trial on the merits and substantial justice has been reached."); Shanklin v. Commonwealth, 222 Va. 862, 864-65 (1981) (concluding a court committed harmless error in limiting cross-examination of the witness because sufficient evidence existed to support the conviction); Cousins v. Commonwealth, 56 Va. App. 257, 276 (2010) (noting "harmless-error review [is] required" while reviewing the improper restriction of cross-examination (quoting Ferguson v. Commonwealth, 240 Va. ix, ix (1990))); Scott v. Commonwealth, 25 Va. App. 36, 45 (1997)

- 7 -

(holding that a trial court's refusal to allow cross-examination regarding a witness' prior misdemeanor convictions was beyond a reasonable doubt harmless error). But see Campbell, 49 Va. App. at 504-05 (holding that the trial court abused its discretion because it arbitrarily refused to allow a party to cross-examine the witness at all (citing Food Lion, Inc. v. Cox, 257 Va. 449, 450-51 (1999))). As such, this Court should review for harmless error.

When a trial court commits a non-constitutional error,[2] a reviewing court will look at whether the record plainly discloses "that the parties have had a fair trial on the merits and substantial justice has been reached." See Code § 8.01-678; Clay, 262 Va. at 259. As part of this harmless error analysis, this Court must look at whether the alleged error substantially influenced the factfinder. Clay, 262 Va. at 259. If this Court cannot conclude whether the error substantially swayed the factfinder's determination, the judgment will be reversed. Id. at 260. Yet, the judgment will stand if the error had no or only slight influence. Id.

In this case, the mother had a fair trial on the merits and substantial justice was reached. Most of the proffered testimony was introduced to the record either in the social worker's or the mother's direct examination. Additionally, the foster care plan, which the mother admitted to the record, contained a list of all the services the mother had completed. Accordingly, the mother successfully moved into evidence all the facts proffered through the DSS report or the mother's direct testimony. As noted, we presume the trial court weighed all the evidence, considered the mandatory statutory factors, and ruled based on the twins' best interests. See Castillo, 68 Va. App. at 558. As discussed in the following section, the circuit court had clear and

---

[2] In an unpublished case, this Court declined to find a constitutional error in a termination of parental rights case because the constitutional right that is violated by limiting cross-examination arises from the Confrontation Clause, which applies to criminal, not civil, cases. Saenz-Romero v. Arlington Cnty. Dep't of Hum. Servs., No. 1110-11-4, slip op. at 4 (Va. Ct. App. Mar. 6, 2012). We find this reasoning persuasive.

convincing evidence termination was in the twins' best interests and the mother was unable to substantially remedy the conditions that led to foster care placement.

In all, because the circuit court admitted all the evidence the mother proffered during the social worker's cross-examination through other avenues and had clear and convincing evidence the Code § 16.1-283(C)(2) factors were met, the circuit court's restriction on the scope of the mother's cross-examination had no influence on the outcome. Therefore, the court's error was harmless.

### D. The Circuit Court Did Not Abuse Its Discretion in Terminating the Mother's Parental Rights

In termination of parental rights cases, the trial court's paramount concern is the child's best interests. Farley, 9 Va. App. at 327-28. Within that analysis and pursuant to Code § 16.1-283(C)(2), a court must look at (1) the child's best interests and (2) whether the parent substantially remedied the conditions that led to the child's placement in foster care. Thach, 63 Va. App. at 169. The parental rights termination statute must be strictly followed before a parent's rights are terminated to "protect the rights of the parents and their child." Id. (quoting Layne v. Layne, 61 Va. App. 32, 36-37 (2012)).

Under the first prong, the circuit court must consider:

> the age and physical and mental condition of the child; the age and physical and mental condition of the parent; the relationship existing between the parent and the child; the needs of the child; the role the parent has played, and will play in the future, in the upbringing and care of the child; and any other such factors that are necessary.

Id. If the circuit court finds clear and convincing evidence that termination is in the child's best interests, the circuit court reviews the second prong. Id. at 170.

The second prong requires the court to find clear and convincing evidence that

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months

> from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Code § 16.1-283(C)(2); see also Thach, 63 Va. App. at 170.

The record reveals the circuit court had clear and convincing evidence that the termination was in the twins' best interests and the mother failed to substantially remedy the conditions that led to removal, despite the various services DSS provided. The mother argues that not only were no criminal charges or confirmed CPS reports filed against her, but she completed everything DSS recommended. She essentially contends that her rights were terminated because she could not secure housing within a particular time frame. Yet, the record discloses a different story.

During its ruling, the circuit court emphasized several key concerns raised in Parker's and the mother's testimony and the DSS report. First, DSS reported the twins, then five years old, were left padlocked in bedrooms for so long they defecated on themselves and the floor multiple times. The mother was aware of the padlock on the door and the urine and feces on the carpet. The foster care plan reported the mother hit the twins with a switch. Moreover, the twins' eldest half-brother allegedly sexually assaulted them while they were inadequately supervised. Once placed in foster care, the twins expressed anxiety about visiting the mother; they eventually declined visits with her.

Additionally, the circuit court relied on the mother's actions and other concerning statements about her relationship status and the twins when it addressed her protective capacity. For example, when asked about the twins' allegations of sexual assault against her eldest son, the mother expressed a "nonchalant attitude" and doubted the veracity of their claims. She even attempted to test the twins by requesting that her eldest son attend visits with her. Additionally,

she continued to reside with a sex offender for most of the time her case was pending in the JDR court. Thus, the circuit court had sufficient evidence to determine termination of her parental rights was in the twins' best interests.

Furthermore, the circuit court emphasized that the mother failed to substantially remedy two of the barriers to reunification, even though DSS provided relevant services. First, she continued to lack protective capacity for the twins, and second, she failed to secure housing. The circuit court noted that she had "substantial time" to remedy her housing situation. Moreover, the record discloses she had almost a year before the JDR court hearing to find housing after discovering she would be on the public housing waitlist for three to six years. It was not until six months after the JDR court hearing, and four days before the circuit court hearing, that the mother secured housing.

Overall, the record displays ample evidence that the trial court's primary concern was the twins' best interests, and DSS proved by clear and convincing evidence the Code § 16.1-283(C)(2) requirements. Therefore, the circuit court did not abuse its discretion in terminating the mother's parental rights.

CONCLUSION

For the foregoing reasons, we affirm the circuit court's order terminating the mother's parental rights.

Affirmed.